**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2020 IL App (3d) 170383-U

Order filed March 3, 2020

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2020

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 12th Judicial Circuit, Will County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-17-0383 Circuit No. 16-CF-2359 |
| CHARMAINE DUNN, | ) ) ) | Honorable Amy M. Bertani-Tomczak, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE WRIGHT delivered the judgment of the court.
Justice Holdridge concurred in the judgment.
Justice McDade specially concurred.

_____

**ORDER**

¶ 1    *Held*: The evidence presented at trial neither varied from the criminal charge as set forth in the indictment, so as to prejudice defendant in the making of her defense, nor rendered the evidence insufficient to prove defendant guilty of resisting a peace officer beyond a reasonable doubt.

¶ 2    Following a bench trial, the trial court found defendant, Charmaine Dunn, not guilty of

aggravated battery but guilty of resisting a peace officer. Defendant appeals her conviction and

argues the State's evidence was insufficient to prove an essential element of the charged offense of resisting a peace officer beyond a reasonable doubt.

¶ 3                                                    I. BACKGROUND

¶ 4        On November 17, 2016, the State charged defendant by indictment. Count II of the indictment is the only count relevant to this appeal. Count II alleged that defendant committed the offense of resisting a peace officer pursuant to section 31-1(a) of the Criminal Code of 2012 (Code) in that "defendant knowingly resisted the performance of James Block of an authorized act within his official capacity, being the arrest of [defendant] for Battery to James Block, knowing James Block to be a peace officer engaged in the execution of his official duties, in that [defendant] pulled her hands away during handcuffing[.]"[1] 720 ILCS 5/31-1(a) (West 2016).

¶ 5        Defendant's bench trial took place on May 22, 2017. The State called Sergeant Sean Talbot of the Bolingbrook Police Department to testify. According to Talbot, he was dispatched to a residence at 441 Sword Way in Bolingbrook around midnight on November 8, 2016, to investigate a 911 caller's report of an ongoing domestic violence incident. Upon arrival, Talbot, along with several other officers, located and spoke with the 911 caller, who was seated in her car that was parked outside of the residence at that location. The caller claimed that defendant and defendant's son would not let the caller's daughter, Dyamond Pickett, and Pickett's three-week-old child leave the residence. In the officers' presence, the 911 caller used her cell phone to place a call to Pickett and allowed the officers to listen in on the phone call. Talbot heard screaming and a woman state that she was not allowed to come out of the residence. Talbot concluded the voice belonged to Pickett.

_____

[1]Count I of the indictment alleged that defendant committed the offense of aggravated battery pursuant to section 12-3.05(d)(4)(i) and (h) of the Code in that "defendant, knowing James Block to be a peace officer performing his official duties *** knowingly caused bodily harm to James Block, in that she punched James Block in the head[.]" 720 ILCS 5/12-3.05(d)(4)(i) & (h) (West 2016).

¶ 6    After listening in on this phone call, Talbot approached and knocked on the front door, but no one answered. Talbot testified that the officers continued to knock and then would walk back to the 911 caller to see if she could convince Pickett to come to the front door. During this time, Talbot could hear a commotion taking place inside the house both over the cell phone and from the front porch. At some point, a male came to the front door and Talbot could see a woman standing back from the front door at the top of the stairs inside of the residence. Talbot indicated that he could not see clearly through the front door because it was stained glass.

¶ 7    The occupants refused to open the door. During the approximate 10-minute period officers stood at the unopened front door, Talbot heard the screaming and the chaos coming from inside the residence become louder and worse. Talbot heard things being knocked over. Fearing for the safety of the young child, the officers forced the front door open. The officers did not have a warrant authorizing entry into the home.

¶ 8    Four officers entered the residence. Talbot immediately came into contact with the male, who was in a fighting stance. Talbot grabbed the male and took him into a bedroom where they fell over some clothing on the floor. Talbot placed the male in custody. Next, Talbot found the other officers struggling to put handcuffs on defendant.

¶ 9    Officer Richard Treece of the Bolingbrook Police Department testified that he was dispatched to the residence on the date and time in question. Treece's testimony was consistent with Talbot's version of the events, including the fact that officers were able to overhear what sounded like a very loud scuffle taking place within the residence. Treece believed someone was being held against their will. Once inside the residence, Treece and Officer Block confronted defendant. Treece witnessed defendant punch Block. The officers pushed defendant against a wall, causing a picture to break, and then attempted to handcuff defendant in a bedroom. Treece

3

testified that it took about 30 seconds to put handcuffs on defendant as "[defendant] was struggling to keep her hands apart from being handcuffed." At this time, Treece saw the young child on a bed located in the same bedroom.

¶ 10    Officer Richard Burdett of the Bolingbrook Police Department testified that he was dispatched to the residence on the date and time in question. Burdett's recollection of the events was consistent with the testimony provided by Officers Talbot and Treece, including the fact that the officers were able to overhear a loud argument emanating from within the residence. Once inside the residence, Burdett assisted Talbot by handcuffing the male.

¶ 11    Officer James Block of the Bolingbrook Police Department testified that he heard screaming and what sounded like an argument coming from inside the residence. Once inside the residence, Block witnessed defendant try to intervene in Talbot's arrest of the male. Block took defendant by the elbows to keep defendant from entering the tussle. Defendant struck Block in the face with a closed fist. At that point, Block and defendant ran into a wall, and a picture frame shattered. Block placed defendant under arrest after a struggle took place on a bed in a bedroom. Block explained that:

> "In the bedroom that we ended up falling into. When [defendant] and I landed on the bed we were on the bottom of the bed where someone's feet might be when they were laying in the bed. [Pickett] and the child were up toward the head of the bed. During the time that I was attempting to get [defendant's] hands behind her back I spoke to [Pickett], I told her to get the child and get out of the house.
>
> * * *
>
> "after we had advised [defendant] she was going to be under arrest and attempted to pull [defendant's] hands behind her back, [defendant] resisted. [Defendant] tightened up her

arms, kept them underneath. It took myself, Sergeant Treece and at the end Sergeant Talbot coming in to get [defendant's] hands behind her back."

¶ 12 The State introduced photographs of Block's bloody lip and the broken picture frame into evidence.

¶ 13 Dyamond Pickett testified that she and her son, who was just a few weeks old at the time, were at the residence on the night in question. Pickett indicated that her son's father and her boyfriend at the time, Jody Ferguson, lived at the residence. That night, she had a loud disagreement with Ferguson regarding the child staying overnight. The disagreement was not physical in nature. Around midnight, Pickett calmly called her mother and asked her mother to pick up her and her son. Picket told her mother nothing was wrong and instructed her mother not to call the police.

¶ 14 Pickett stated that she was not being held against her will. Pickett told the officers through the front door to stop banging on the door and that she just needed to put the child's clothes on. However, officers eventually broke down the door and entered the residence. With regard to the physical confrontation between the officers and defendant, Pickett testified as follows:

> "[defendant] was standing in the hallway next to the pictures literally right by where the pictures were. About three or four officers came up and they just attacked [defendant] and threw her up against the wall where the pictures were. So all I saw at that time was — when they were running toward [defendant], I came back in the room. But still I can see everything. The glass and everything just went in [defendant's] face. [Defendant] had her hands behind her back, and they like tossed her and threw her into the room where we were, into [Ferguson's] room. And they threw her on the bed and were on top of her.

5

> When they slammed [defendant] against the wall they said get your ass against the wall. And then [defendant's] hands were already behind her back because when they came, you know, she just was like I guess they [are] coming for me, and she put her hands behind her back. Then when they swung her into the room and threw her on the bed, they was like get down you fucking animal. *** One officer has like his elbow — well, their arm like in her, like I don't want to say elbow in her back, but like she's face down, they hold her hands like this. And she's like, you know, her head is in the bed or whatever the case may be."

Pickett stated that all the officers were attempting to handcuff defendant at the same time. Pickett did not see defendant punch Block.

¶ 15    Defendant testified on her own behalf that she had lived at 441 Sword Way in Bolingbrook for 14 years. On the night in question, her son, Ferguson, and Pickett had a loud, non-violent disagreement. Defendant attempted to diffuse the argument, telling Ferguson to let Pickett and the child go home. Defendant approached the front door and told officers she would not open the door because they were not needed. After kicking in the front door:

> "police rushed at me, threw me into the wall. I got three glass pictures on the wall. Thank God I didn't get cut with any of the glass. Then they threw me on the bed, almost threw me on my grandbaby. [Pickett] is screaming and hollering, saying why you all doing this to her? She didn't even do anything to you all. So the police officer threw me on the bed. Then they was turning me over and putting handcuffs on me. And he told me I was an f'ing animal.

* * *

6

He said she's up under arrest, you f'ing animal. I am like oh, my God. There was nothing

else for me to say. My body was just limp."

Defendant testified that she did not try to prevent the officers from placing her in handcuffs. The

defense rested, and the trial court took its ruling under advisement.

¶ 16        On May 30, 2017, the trial court found defendant guilty of resisting a peace officer but

found that the State failed to prove defendant possessed the knowledge or intent to commit

aggravated battery. On June 13, 2017, the trial court denied defendant's motion for judgment of

acquittal notwithstanding the verdict and sentenced defendant to serve two days in the Will

County jail and a one-year term of conditional discharge.

¶ 17                                II. ANALYSIS

¶ 18        On appeal, defendant argues the State's detailed indictment should be treated by this

court as a bill of particulars. Based on this theory, defendant submits her conviction should be set

aside because the State's evidence failed to establish, beyond a reasonable doubt, the narrow set

of facts the State elected to include in the language of the indictment. However, with great

candor, defense counsel concedes that this is an issue of first impression unaddressed by existing

caselaw.

¶ 19        The State responds by pointing out that a variance does not exist in the record.

Alternatively, the State submits the variance, if any, between the detailed facts alleged in the

indictment and the evidence is minor. Therefore, the State relies on well established case law to

support the view that any variation in this record is inconsequential and argues defendant's

conviction should be affirmed.

¶ 20        Defendant points out that section 31-1(a) of the Code contains the very broad and

generalized acts. The statute states as follows: "A person who knowingly resists or obstructs the

performance by one known to the person to be a peace officer *** of any authorized act within his or her official capacity commits a Class A misdemeanor." 720 ILCS 5/31-1(a) (West 2016). We agree the essential elements of resisting a peace officer are broadly worded by statute.

¶ 21    Consistent with the statutory language, the case law broadly defines the essential elements of this offense. The Statute provides that the State needed only to prove the essential elements of the offense by showing that: (1) defendant knowingly resisted the peace officer; (2) the peace officer was performing an authorized act in his official capacity; and (3) defendant knew the individual was a peace officer. See *People v. Smith*, 2013 IL App (3d) 110477, ¶ 20.

¶ 22    We also recognize that the indictment contained language that was more specific than the statute by alleging that defendant resisted "in that [defendant] pulled her hands away during handcuffing[.]" In essence, we interpret defendant's argument to assert that the detailed facts set forth in this indictment, narrow the scope of the evidence the trier of fact should be allowed to consider when deciding guilt or innocence.

¶ 23    Defendant invites this court to issue a decision that narrows a broadly defined essential element for any offense, once the State describes an essential element with very specific factual allegations in an indictment. For the reasons that follow, we decline to treat the indictment as a bill of particulars for purposes of this appeal.

¶ 24    Significantly, the trial court did not find it necessary to order the State to prepare a bill of particulars for the benefit of the defense. Therefore, we conclude the case law creating evidentiary consequences following the preparation of a court-ordered bill of particulars has no application here.

¶ 25    More importantly, based on this record, we reject the notion that the facts alleged in the actual indictment contained in this record, and the facts the prosecution established during this

trial, varied with respect to each other. Here, the language of the indictment alleged that defendant resisted "in that [defendant] pulled her hands away during handcuffing[.]" Consistent with the indictment, Officer Block testified that it took three officers to pull defendant's arms behind her back, enabling the officers to place handcuffs on defendant's wrists. Block stated that defendant "tightened up her arms, kept them underneath[,]" after learning she was going to be placed under arrest. Officer Treece corroborated Officer Block's testimony by stating that it took approximately 30 seconds to handcuff defendant because defendant was struggling to "keep her hands apart." Officer Talbot also testified that he witnessed several officers struggling to place handcuffs on an uncooperative defendant. Based on the officers' testimony, we conclude the State's evidence did not vary from the language of the indictment.

¶ 26    Even if we held that this detailed indictment should be treated as a bill of particulars, which we have not done, a variance is only fatal where it misleads a defendant in the making of his or her defense. *People v. Long*, 65 Ill. App. 3d 21, 23 (1978); See also *Smith*, 2013 IL App (3d) 110477, ¶ 14. Even assuming, *arguendo*, that a minor variance exists in this case, defendant concedes that the indictment, which she would like us to treat as a bill of particulars, provided her with adequate notice of the charges against her. Consequently, the relief defendant requests in this appeal would not be appropriate.

¶ 27    Although we are unpersuaded that this record should cause our court to embark on a journey to narrow what constitutes the essential elements of this particular crime, we have undertaken a careful review of the sufficiency of the evidence contained in this record. We do so in the interests of justice after recognizing defense counsel concedes that the State's evidence was sufficient to establish resisting a peace officer as generally described by the statute.

¶ 28     After viewing the evidence in the light most favorable to the prosecution, we agree that any rational trier of fact could have found the general, statutory, essential elements of the crime were proven beyond a reasonable doubt. *People v. Collins*, 106 Ill. 2d 237, 261 (1985). For these reasons, we affirm defendant's conviction.

¶ 29                                    III. CONCLUSION

¶ 30     The judgment of the circuit court of Will County is affirmed.

¶ 31     Affirmed.

¶ 32     JUSTICE McDADE, specially concurring:

¶ 33     I agree with the majority's decision to affirm Charmaine Dunn's conviction for resisting a peace officer.  I write separately to comment on the unique argument she has advanced in this appeal.

¶ 34     Despite the clear similarities of Dunn's argument on appeal to a fatal variance claim, and despite her reliance on that law in her original brief, she states unequivocally in her reply brief that she is *not* making a fatal variance claim.  It is therefore unnecessary for us to undertake such an analysis.  Additionally, as Dunn has not raised and her case does not involve a bill of particulars, it is likewise unnecessary for us to discuss that area of the law.

¶ 35     At its essence, Dunn's challenge on appeal is that the State failed to prove her guilty beyond a reasonable doubt of resisting a peace officer.  She focuses on the very specific language in the charging instrument alleging that she resisted arrest "in that she pulled her hands away during handcuffing."  As I understand her argument, Dunn asserts that the *manner* in which she allegedly resisted arrest was made an essential element of the offense by the language of the indictment.  She contends that because the State only showed that she held her hands apart

to prevent the handcuffing, it failed to prove this "essential element" and she was not, therefore, proven guilty beyond a reasonable doubt of resisting arrest.

¶ 36 Dunn's effort to find a foothold among tenuous theories runs headlong into bedrock constitutional and construction principles. The Illinois Constitution vests the right and power to enact laws, which necessarily includes establishing the essential elements of criminal offenses, *solely* in the legislature. That power is not shared with the States' Attorneys of Illinois and certainly not by the haphazard mechanism of crafting the language used in framing a criminal charge. Nor is the law-making power shared with the courts. Our role is limited to interpreting the law, and the rules of statutory construction that restrain our interpretation of the meaning and reach of enacted state law prohibit us from rewriting a statute to create something other than what the legislature intended. *Van Dyke v. White*, 2019 IL 121452, ¶ 42 ("[w]hen interpreting a statute, the court's primary objective is to ascertain and give effect to the intent of the legislature"); *People v. Clark*, 2019 IL 122891, ¶ 47 (quoting *People v. Smith*, 2016 IL 119659, ¶ 28) (" '[n]o rule of construction authorizes this court to declare that the legislature did not mean what the plain language of the statute imports, nor may we rewrite a statute to add provisions or limitations the legislature did not include' "). Faced with those unambiguous restrictions, we can only find, as prior courts in similar situations have done, that the language added by the State to the indictment is mere surplusage and without meaning or significance.